UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAURA BETH HICKS, on behalf of
herself and similarly situated employees,

      Plaintiff,

                              Case No. 2:17-cv-12674

v.                                    Hon. George Caram Steeh

GREAT LAKES HOME HEALTH
SERVICES, INC. and GREAT               Magistrate Judge R. Steven Whalen
LAKES ACQUISITION CORP., *d/b/a*
GREAT LAKES CARING,

      Defendants.

_____

**Brief in Opposition to Plaintiff's Request for Fees**

# Table of Contents

Controlling or Most Appropriate Authorities ........................................................ iii

Introduction ........................................................................................................... 1

I.    Plaintiff's requested lodestar is excessive. ..................................................... 2

      A.    Plaintiff's petition is filled with duplicative, excessive, and inappropriate expenditure of time, particularly in light of the limited success achieved. .................................................. 3

            1.    Duplicative and excessive time (including overstaffing.) ................................................................. 4

            2.    Administrative and Clerical Time ................................. 6

            3.    Travel Time ................................................................... 7

            4.    Remaining Certification/Hutchins Time. ..................... 8

      B.    Counsel's Hourly Rates are Excessive and/or Entirely Unjustified. ............................................................................... 9

      C.    An across-the-board reduction to the lodestar of 50% should be made due to the partial success in failing to achieve conditional certification. ......................................... 12

      D.    Plaintiff's Costs Are Unreasonable and Should Be Reduced. ............................................................................... 13

      E.    Based on the above adjustments, a reasonable lodestar figure would be $36,342.84 ................................................. 15

II.    Plaintiff would have had no more than a 1-in-4 chance of prevailing at trial, and thus the lodestar should be reduced a further 75% per the terms of the parties' settlement agreement to $9,085.71 total. ......................................................................... 17

      A.    Defendants' analysis of Hicks's time, even giving her the benefit of every doubt, showed less than 40 hours per week—and Hicks is no longer entitled to the benefit of the doubt at the trial stage. ............................................. 18

B.   Defendants would have provided testimony from other nurses, doing the same jobs, to show that the actual time needed to perform the visits was far less than Hicks claimed. ............................................................................19

C.   Hicks's *own*, undisputedly accurate timekeeping from January 2016 for the same types of visits shows that her 2015 time estimates were grossly excessive. ......................................20

D.   Hicks has severe credibility problems, including her admission to signing an affidavit under oath that she barely read and that was admittedly filled with inaccuracies. ....................................................................21

## Controlling or Most Appropriate Authorities

### Cases

*American Key Corp. v. Cumberland Assocs.*,
102 F.R.D. 496 (N.D. Ga. 1984) ........................................................................ 14

*Barfield v. New York City Health & Hosps. Corp.*,
537 F.3d 132 (2d Cir. 2008) ............................................................................. 13

*Blum v. Stenson*,
465 U.S. 886 (1984). ......................................................................................... 9

*Citizens Insurance Co. v. Graceland Fruit*,
2007 WL 2902213 (W.D. Mich. 2007) ............................................................ 14

*Disabled Patriots of Am., Inc. v. Taylor Inn Enters., Inc.*,
424 F. Supp. 2d 962 (E.D. Mich. 2006) ............................................................ 7

*Farrar v. Hobby*,
506 U.S. 103 (1992) ........................................................................................... 1

*Fed. Trade Comm'n v. Abili-Staff, Ltd*,
2010 WL 11598073 (W.D. Tex. Oct. 7, 2010) ................................................... 5

*Feldman v. Oakland Univ. Bd. of Trs.*,
2010 WL 2572768 (E.D. Mich. June 23, 2010) ............................................... 10

*Gonter v. Hunt Valve Co., Inc.*,
510 F.3d 610 (6th Cir. 2007) ............................................................................. 1

*Goodwin v. Metts*,
973 F.2d 378 (4th Cir. 1992) ............................................................................. 4

*Gratz v. Bollinger*,
353 F. Supp. 2d 929 (E.D. Mich. 2005) ......................................................... 8, 9

*Grendel's Den v. Larkin*,
749 F.2d 945 (1st Cir. 1984) ............................................................................. 4

Hensley v. Eckerhart,
461 U.S. 424 (1983) ...................................................................................... 2, 3

*Hescott v. City of Saginaw*,
    2015 WL 13589671 (E.D. Mich. June 19, 2015)....................................................8

*Missouri v. Jenkins,*
    491 U.S. 274 (1989) ...........................................................................................6

*Munger v. First Nat'l Collection Bureau, Inc.*,
    2016 WL 3964813 (E.D. Mich. July 25, 2016)................................................3, 4

*Pelayo v. Platinum Limousine Servs., Inc.*,
    2016 WL 5402185 (D. Haw. Sept. 27, 2016) ....................................................13

*Perotti v. Seiter*,
    935 F.2d 761 (6th Cir. 1991).................................................................................8

*Reed v. Rhodes*,
    179 F.3d 453 (6th Cir. 1999) ................................................................................9

*Reeser v. Henry Ford Health Sys.*,
    2017 WL 4405026 (E.D. Mich. Oct. 4, 2017) ....................................................10

*Segovia v. Montgomery County*, *Tenn.*,
    493 Fed. Appx. 488 (6th Cir. 2014) ............................................................ 14, 15

*Trustees of Detroit Carpenters Fringe Ben. Funds v. Lempert Const., Inc.*,
    1995 WL 871160 (E.D. Mich. Aug. 21, 1995) ....................................................7

*Ursic v. Bethlehem Mines*,
    719 F.2d 670 (3d Cir.1983) ..................................................................................6

*Wynn v. Chanos*,
    2015 WL 3832561 (N.D. Cal. June 19, 2015) .....................................................5

*Zapata Gulf Marine Corp., v. Puerto Rico Maritime Shipping Auth.,*
    133 F.R.D. 481 (E.D. La. 1990) .........................................................................14

**Other Authorities**

Hirsch *et al.*, Awarding Attorneys' Fees and Managing Fee Litigation
    (3rd Edition), Federal Judicial Center 2015 ........................................................3

## Introduction

This is not a normal fee reduction petition after a liability finding. Nor is it part of a normal settlement process whereby the Court is required by statute to consider fees and costs. Rather, the parties have agreed, as part of its settlement agreement approved by the Court, to have the Court set the fee amount to be paid by Defendant to Plaintiff's attorneys in settlement of the claims and to do so in light of Defendant's arguments Plaintiff would not have prevailed at trial. The Court need not issue an opinion; only the number at which the case settles. The Court's decision—in a binding mediation-like fashion—is not appealable. The agreement, therefore, contemplates the Court take a two-step approach. First, determine a reasonable lodestar measure and, second, reduce that amount by chances of success.

In the normal course, "primary concern" surrounding an award of attorneys' fees is that the award be reasonable. *Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 616 (6th Cir. 2007). And the "most critical factor in determining a fee award's reasonableness is the degree of success obtained." *Farrar v. Hobby*, 506 U.S. 103 (1992). Thus, the reality of this case must not be ignored: Ms. Hicks's counsel primarily bring FLSA collective actions, R. 53-1, Pg ID 1970, and Ms. Hicks was a hoped for vehicle for counsel to obtain nationwide certification. They failed in that goal, obtaining "conditional certification" of a class of one, and a $2,000

settlement to avoid far more expensive, and unrecoverable, trial costs to Defendants. Moreover, that settlement expressly calls for the Court to determine the likelihood that Plaintiff would have even prevailed at trial, and reduce fees according to those chances.

Here, Plaintiff's "lodestar" calculation is filled with duplicative, unwarranted time entries inappropriate for the prosecution of a single-plaintiff case, and would have been a mere fraction of the nearly $146,000 that they are now claiming. Moreover, the chances that Plaintiff's counsel would have even won at trial are low; Hicks's "proof" that she worked overtime is based entirely on her memory, which is strongly controverted by the circumstantial evidence, and by her significant credibility problems. The Court should find that Ms. Hicks's chances of success at trial would have been at best 25%, and thus reduce the lodestar by a further 75%.

## I.    Plaintiff's requested lodestar is excessive.

The Supreme Court has held that a court determining fees should begin with the "lodestar" amount—the "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The district court should "exclude from this initial fee calculation hours that were not reasonably expended." *Id.* at 434 (internal quotation marks omitted). Courts may then look to "other considerations that may lead the district

court to adjust the fee upward or downward"—"the most critical factor" of which

"is the degree of success obtained." *Id.*

> **A.      Plaintiff's petition is filled with duplicative, excessive, and inappropriate expenditure of time, particularly in light of the limited success achieved.**

Plaintiff's counsel concedes that, given their failure to obtain any class

recovery (by certifying a "class" that consisted only of the Plaintiff), they should

not be awarded any fees related to certification. R. 53, Fee Petition, Pg ID 1958.

That concession is consistent with the law. *See, e.g., Munger v. First Nat'l*

*Collection Bureau, Inc.*, 2016 WL 3964813, at *3 (E.D. Mich. July 25, 2016) ("It

is common in cases where a class is decertified or no class recovery is realized to

disallow the time spent on class issues") (citing cases). But while counsel purports

to have removed such class-related time from their petition (a few such entries in

fact remain, *see infra*), they still seek fees for *five* attorneys—obvious overkill on a

single-plaintiff FLSA case involving a mere ten weeks of alleged overtime.

Plaintiff's fee petition thus ignores a simple fact: But for counsel's failed

desire to seek a collective-action recovery, they would have had no justifiable

reason to have that many attorneys and staff billing on the case, if ever they did.

Courts routinely reduce fee petitions to account for overstaffing. *See, e.g.*, Hirsch

*et al., Awarding Attorneys' Fees and Managing Fee Litigation* (3rd Edition),

Federal Judicial Center 2015, pp. 31-32 (citing *Goodwin v. Metts*, 973 F.2d 378,

383–84 (4th Cir. 1992) (fees cut in half because firm used several attorneys when one or two would have sufficed)); *Grendel's Den v. Larkin*, 749 F.2d 945, 953 (1st Cir. 1984) ("we see no justification for the presence of two top echelon attorneys at each proceeding.")). And such reductions are particularly appropriate here; otherwise, counsel would effectively be rewarded for their unsuccessful class claims, albeit through indirect means. *Cf. Munger*, 2016 WL 3964813, at *3 (rejecting request for recovery of over $100,000 in fees from five plaintiff's attorneys on a $3,000 individual judgment, after class claims evaporated). Beyond overstaffing, there are many other problems with the petition. The following changes should be made in calculating the lodestar (with a coded Excel spreadsheet attached as Exhibit A).

**1.      Duplicative and excessive time (including overstaffing.)**

Given the fact that Plaintiff's "success" in this case was limited to a single-plaintiff, ten-week FLSA claim, there is no reasonable justification for two out-of-state Plaintiff's law firms (*not* including local counsel Sommers Schwartz, who do not seek fees) to have been substantively involved in this case. Indeed, the reason for Plaintiff having two different out-of-state law firms—particularly since both firms claim expertise in FLSA actions—is never even explained in the fee petition or the two counsel affidavits, let alone justified as a reasonable practice. *See* R. 53, Pg ID 1965; *see generally* R. 53-1, R. 53-2.

Absent such justification, the Court would be warranted in disallowing fees for Barrett Johnston entirely, insofar as Winebrake & Santillo appears to have been the firm primarily litigating the matter. *See supra* at 3; *see also, e.g.*, *Fed. Trade Comm'n v. Abili-Staff, Ltd*, 2010 WL 11598073, at *3 (W.D. Tex. Oct. 7, 2010) (reducing total billings by 55% where attorneys "have not adequately explained why two law firms, six lawyers, and three paralegals and legal assistants were necessary to defend this case."); *Wynn v. Chanos*, 2015 WL 3832561, at *3 (N.D. Cal. June 19, 2015), *aff'd,* 685 F. App'x 578 (9th Cir. 2017) (finding it reasonable to hire two law firms where one was a specialist and the other familiar with the individual client, but only where the dual retention "should result in greater efficiency and a lower amount of total hours billed. That did not occur here.").

But even if the Court did not preclude billing by a second law firm whose presence was not justified, the fees requested reflect a significant amount of unnecessary duplication of efforts. For instance, *all five* attorneys at both firms worked on Plaintiff's summary judgment brief. Ex. A, Defendants' Summary Chart (*see* time entries from 1/12/2018 to 1/22/2018). Both worked on responding to Defendant's summary judgment brief. *Id.* (*see, e.g.*, time entries from 2/13/2018 to 2/26/2018). Likewise, attorneys from both firms bill time to drafting and revising the complaint, a complaint largely unchanged from the predecessor case *Hutchins v. Great Lakes*, Case No. 1:17-cv-10210-GCS-DRG, Dkt. No. 1. (*see*

time entries from 8/8/2017-8/10/2017). Both worked on discovery. And, as might

be expected when there are two firms in different states on the same case, there are

numerous phone calls and emails between lawyers at the different firms to discuss

their duplicative work; multiple lawyers read the same documents; and there are

occasional mismatches of time (for example, on 11/26/2018, Paul Winebrake

listing 0.1 for a phone call with David Garrison, but Garrison listing 0.6 for the

same call.)  There is no justification for this duplicative time, whether within one

firm or across two firms. All such duplicative time—totaling 94.9 hours as

identified in Exhibit A—should be eliminated.

### 2.    Administrative and Clerical Time

Courts evaluating fee petitions should not "approve the wasteful use of

highly skilled and highly priced talent for matters easily delegable to non-

professionals or less experienced associates." *Ursic v. Bethlehem Mines*, 719 F.2d

670, 677 (3d Cir.1983). Courts thus routinely disallow attorney's fees for clerical

or administrative tasks billed as if by a professional. *See Missouri v. Jenkins,* 491

U.S. 274, 288 n.10 (1989) (agreeing that it "is appropriate to distinguish between

legal work, in the strict sense, and investigation, clerical work, compilation of facts

and statistics and other work which can often be accomplished by non-lawyers").

Indeed, "clerical or administrative tasks are generally absorbed into an attorney's

hourly rates as part of the firm's overhead," and are not subject to recovery as

attorney's fees at all. *Trustees of Detroit Carpenters Fringe Ben. Funds v. Lempert Const., Inc.*, 1995 WL 871160, at *2 (E.D. Mich. Aug. 21, 1995); *see also, e.g.*, *Disabled Patriots of Am., Inc. v. Taylor Inn Enters., Inc.*, 424 F. Supp. 2d 962, 967 (E.D. Mich. 2006) (clerical work performed by legal assistants "should be included in attorney billing rates as overhead to run the office, not recoverable in a motion for attorney fees.").

Here, Plaintiff's billings are rife with obvious clerical and administrative tasks—most by Barrett & Johnston, but some by Winebrake & Santillo. *See* Ex. A. Among the things that plaintiff tries to recover for are "Book Hotel reservations for depositions," "Update case file," saving documents to the system, and at least one instance were a legal professional "completed [Mr. Garrison's] ECF training." *Id.* Nothing in the attorney declarations explain or justify these clerical and administrative expenses being billed as hourly time—and, indeed, the fact that most of the administrative time is billed to an anonymous "professional staff" rather than an identified paralegal is further proof of the clerical and administrative nature of this time. All of the administrative time should be removed from the lodestar calculation, in the amount of 31.5 hours. (See Exhibit A.)

### 3.    Travel Time

The Sixth Circuit has held that awarding fees for time spent in travel is within the discretion of the court, in light of its "greater familiarity with local

practice . . .” *Perotti v. Seiter*, 935 F.2d 761, 764 (6th Cir. 1991). Defendants'

experience is that fewer and fewer clients allow billing for travel time itself, but

only for substantive work done while travelling, and local travel time is almost

never compensable. *See* Ex. B, Declaration of Thomas G. Kienbaum. To the extent

substantive work is done while traveling (e.g. on an airplane), that is appropriate. It

would be extremely inappropriate to charge a client twice for the same time; i.e.,

for both travel and substantive work performed during travel. *Id.* Here, Plaintiffs

again offer no justification or argument that local practice would allow any billing

of travel time. All of the 52.1 hours of travel time should be eliminated from the

lodestar calculation. (Exhibit A.)

And, moreover, even if the Court were to allow Plaintiff's counsel to bill for

travel time, it should consider that this time was only necessary because Plaintiff

had out-of-state counsel. In these circumstances, it is appropriate to limit any

allowed travel time to 50% of the "reasonable hourly rate" for those counsel. *See,

e.g., Gratz v. Bollinger*, 353 F. Supp. 2d 929, 943 (E.D. Mich. 2005); *see also, e.g.,

Hescott v. City of Saginaw*, 2015 WL 13589671, at *6 n.6 (E.D. Mich. June 19,

2015) (permitting half compensation for time spent in transit).

### 4.    Remaining Certification/Hutchins Time.

Finally, although Plaintiff conceded that certification and Hutchins-related

time should be disallowed, some of the time entries relate to those matters (for

example, related to Hicks's opt-in consent form which is not necessary for a single-plaintiff FLSA claim) and should also be removed. This amounts to 2.1 hours. (Exhibit A.)

**B.    Counsel's Hourly Rates are Excessive and/or Entirely Unjustified.**

The Sixth Circuit has held that hourly rates should not exceed the market rates necessary to encourage competent lawyers to undertake the representation in question. *Reed v. Rhodes*, 179 F.3d 453, 472 (6th Cir. 1999). And in order to establish market rates, the U.S. Supreme Court has made clear that the attorney seeking fees must "justify the reasonableness of the requested rate or rates," with the "burden on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 896 n. 11 (1984).

Further, because the fee-shifting statute "only guarantees Plaintiffs competent counsel, not the best and/or most expensive counsel," *Gratz v. Bollinger*, 353 F. Supp. 2d 929, 948 (E.D. Mich. 2005), courts frequently look to the average rates set forth in the State Bar of Michigan's "Economics of Law Practice in Michigan" report as the best evidence in determining whether a party's requested rate is reasonable. *See id.* (using average billing rates in the state);

*accord, e.g., Feldman v. Oakland Univ. Bd. of Trs.*, 2010 WL 2572768, at *5 (E.D. Mich. June 23, 2010) (finding requested rates excessive in light of median rate for attorneys set forth in Economics of Law, given years of experience). Under this analysis, Plaintiff's requested rates are excessive.

Plaintiff proposes that the Court follow its practice in *Reeser v. Henry Ford Health Sys.*, 2017 WL 4405026, at *2 (E.D. Mich. Oct. 4, 2017) (Steeh, J.), but Plaintiff's self-assigned rates are inconsistent with the Court's analysis there. In *Reeser*, the Court accepted the plaintiff's reference to reported fees "based on location and type of practice, namely, employment law in Detroit" from the 2014 version of the Economics of Law Practice report, where the requested fees were $300, $250, and $275 for the three lawyers. But the Court *also* found those rates were consistent with the "years in service" rates for the attorneys in question. Those rates from the 2014 report (Ex. C) were as follows:

| 2014 REPORT | 25th Percentile | Median | Mean | 75th Percentile |
|---|---|---|---|---|
| Downtown Detroit | $195 | $275 | $304 | $400 |
| Employment Law (Plaintiff) | $200 | $250 | $274 | $330 |
| 3-5 years' experience | $160 | $200 | $205 | $250 |
| 6-10 years' experience | $180 | $225 | $236 | $283 |
| 11-15 years' experience | $195 | $250 | $260 | $300 |
| 26-30 years' experience | $200 | $250 | $279 | $347 |

Looking at the rates at the time, the Court accepted these because the $250, $275, and $300 rates fell within the range of the median/mean, and were *between* the 25th and 75th percentiles. Here, plaintiff's counsel omit this full analysis, and arbitrarily choose, for most attorneys, rates *at or above* the 75th percentile, rather than a rate within each of the three metrics. Given the <u>current</u> charts, the requested rates for most of the attorneys is far too high:

| 2017 REPORT | 25th Percentile | Median | Mean | 75th Percentile |
|---|---|---|---|---|
| Downtown Detroit | $200 | $250 | $286 | $350 |
| Employment Law (Plaintiff) | $250 | $300 | $313 | $380 |
| 3-5 years' experience | $175 | $209 | $219 | $250 |
| 6-10 years' experience | $195 | $225 | $239 | $283 |
| 11-15 years' experience | $200 | $250 | $275 | $300 |
| 26-30 years' experience | $200 | $250 | $278 | $328 |

Ex. D (2017 Report). Using these numbers, and endeavoring to stay within the relevant ranges as best as possible:

- Frank's rate of $250 is plausible, if high: it is the 75th percentile for experience but at the 25th percentile for employment lawyers generally.

- Gottesfeld's $300 rate is likewise plausible, if high: it is slightly below the mean for employment lawyers but slightly above the 75th percentile for experience.

- Garrison's rate of $380 is excessive. It is $105 *above* the mean for someone with his years of experience, and *at* the 75th percentile (not below it) for employment lawyers. His rate should be reduced to $313,

the mean for employment lawyers, which still puts him slightly above the 75% percentile for experience.

- Santillo's rate is equally excessive, as he falls into the same experience category as Garrison. $313 is the appropriate rate, at best.

- Winebrake's rates are *grossly* excessive. His claimed $485 rate is $207 above the mean rate for his experience, and $105 above the 75th percentile for employment lawyers. $316 is the appropriate rate (a figure that reflects the slight difference between the value of his years' experience compared to Santillo and Garrison, per the above chart).

Thus, following the *Reeser* analysis, the following rates should be used: Frank ($250); Gottesfeld ($300); Garrett ($313); Santillo ($313); Winebrake ($316).

Finally, Plaintiffs seek to recover $140 an hour for "professional staff," who are *not* identified as even being paralegals, and appear to be secretaries or other purely administrative staff members. They have no justification for such a rate, which is nearly identical to the $150 rate for an actual attorney with less than a year's experience at the 25th percentile. *See* Ex. D. The Court should decline to award any "professional" time due to the lack of justification, but if it were to award anything, it should be half of that inexperienced attorney rate, or $75 at most.

## C.   An across-the-board reduction to the lodestar of 50% should be made due to the partial success in failing to achieve conditional certification.

Courts have recognized that when, as here, a party does not obtain collective action certification, the lodestar may be reduced to account for the partial success in that Plaintiffs did not obtain conditional certification. In *Barfield v. New York City*

*Health & Hosps. Corp.*, 537 F.3d 132, 152 (2d Cir. 2008), the Second Circuit agreed that where the "plaintiff's primary aim in this litigation, as reflected in her complaint and in the first four months of litigation . . . was to certify a collective action," her "motion failed because counsel could not even make the 'modest factual showing' required to support an FLSA collective action," the recovery of $1,744.50 in compensatory and liquidated damages for the plaintiff reflected "only a small degree of success." It thus affirmed a 50% reduction in the lodestar as a result. *Id.* at 152-53. Likewise, in *Pelayo v. Platinum Limousine Servs., Inc.*, 2016 WL 5402185, at *9 (D. Haw. Sept. 27, 2016), for instance, the district court agreed with the magistrate judge that "No reasonable person would pay a lawyer $141,347.00 or even $73,013.00 to win $5,575.00," and found that a 50% reduction in the lodestar was appropriate "in light of Plaintiff's limited monetary success relative to the hours expended" and "the fact that their desired pursuit of a collective action was denied," among other things. As no reasonable person would pay a lawyer $145,000 to win $2,000, a 50% reduction of the lodestar *at minimum* is warranted here.

## D.   Plaintiff's Costs Are Unreasonable and Should Be Reduced.

The award of statutory costs is a matter for the district court, in its best judgment as to what was reasonable and necessary. Recoverable out-of-pocket expenses are those incurred by the attorney that are normally charged to a fee-paying client in the course of providing legal services. *See, e.g., Segovia v. Montgomery*

*County*, *Tenn.*, 493 Fed. Appx. 488, 492 (6th Cir. 2014). Here, Plaintiff seeks to recover expenses in the amount of $9,872.10, albeit in a single, perfunctory paragraph of their fee petition that does not explain or justify any particular cost. *See* R. 53, Pg ID 1967. If any costs are permitted, they should be reduced as excessive.

*First*, Plaintiff's first firm (Santillo & Winebrake) has 31 billing entries for "photocopy" and 4 entries for "postage," totaling $859.69. R. 53-1, Pg ID 1995. But Plaintiff provides absolutely no detail for these entries, making it impossible to determine what the costs were actually used for, let alone that it was a cost reasonable and necessary to the litigation. For that reason, these cost entries should be denied. *American Key Corp. v. Cumberland Assocs.*, 102 F.R.D. 496, 499 (N.D. Ga. 1984) (fee applicant must provide sufficient information to demonstrate the expense was necessary; "[t]he mere recitation of the phrase 'necessarily obtained for use in the case' is not sufficient"); *Zapata Gulf Marine Corp., v. Puerto Rico Maritime Shipping Auth.,* 133 F.R.D. 481, 484 (E.D. La. 1990) (rejecting photocopying expense claim because plaintiff failed to specify what was being copied and how it was used); *Citizens Insurance Co. v. Graceland Fruit*, 2007 WL 2902213 (W.D. Mich. 2007) (reducing award by 25% factor due to vague billings for copying expenses).

*Second*, both law firms charge for travel—which, as discussed above, should not be permitted: Plaintiff has made no showing as to the practice on reimbursement

for travel costs, and—with the exception of the travel to Chicago for the Plaintiff's October 24, 2017 deposition—would not have been incurred by in-state counsel, and thus is not reasonable or necessary. Even then, the travel costs are excessive and perhaps duplicative; for instance, the Barrett firm includes a 10/23/2017 charge for "DWG hotel re: L. Hicks Depo" at $540 (which is a very pricey hotel room). R. 53-2, Pg ID 2041. But then, on 12/21/2017, there is a charge for $1370.30 for "lodging" on 10/25/2017, with no explanation as to this exorbitant rate incurred the day *after* Plaintiff's deposition (which ended at 3:49 pm Chicago time.). The rest of these expenses—including an extra, unexplained night at $1,370.30—are grossly excessive. A perfectly fine hotel room for one night in Chicago would run $250.

Further, the Barrett firm charges as costs the travel expenses *of Plaintiff herself.* R. 53-2. Pg ID 2041. This is particularly inappropriate. The recoverable expenses under the fee-shifting statutes are those "incurred by the attorney which are normally charged to a fee-paying client in the course of providing legal services," *see Segovia*, *supra.* A *client's* own travel expenses are not incurred by the attorney and charged to the client; they are personal expenses of the client herself. Plaintiff raises no argument suggesting otherwise, or that the client's personal expenses are chargeable as attorney's fees and costs to the Defendant.

### E.    Based on the above adjustments, a reasonable lodestar figure would be $36,342.84.

Based on the above, the following is a reasonable lodestar figure:

| Attorney | Adjusted Hours | Rate | Base | 50% reduction |
|---|---|---|---|---|
| Gottesfeld | 112.3 | $300 | $33,690.00 | $16,845.00 |
| Santillo | 7.7 | $313 | $2410.10 | $1,205.05 |
| Winebrake | 42.5 | $316 | $13,430.00 | $6,715.00 |
| Garrison (if 2nd firm allowed) | 31.5 | $313 | $9,859.50 | $4,929.75 |
| Frank (if 2nd firm allowed) | 14.7 | $250 | $3,675.00 | $1,837.50 |
| "Professionals" (if 2nd firm *and* non-lawyer time allowed) | 13.4 | $75 | $1,005.00 | $502.50 |
| **TOTAL** | 222.10 | | $64,069.60 | $32,034.80 |

| Costs Adjustment | Reduction Amount | Notes |
|---|---|---|
| **REQUESTED COSTS** | $9,872.10 | |
| Santillo & Winebrake Photocopying/Postage | $859.69 | Entire request. *See supra* at Part I.D. |
| Travel (S&W) | $2,503.99 | Entire request. *See supra* at Part I.D. |
| Travel (Barrett) | $1660.34 | Reflects reduction of hotel from $540.04 to $250 and elimination of 2nd night lodging of $1370.30 |
| Travel (Plaintiff) | $540.04 | Entire request. *See supra* at Part I.D. |
| **TOTAL REDUCTION** | **$5,564.06** | |
| **Adjusted Costs** | $4,308.04 | |

Adding together the total adjusted fees plus the adjusted costs equals a lodestar of $36,342.84. The Court should thus start from that figure, and—per the settlement agreement—reduce the lodestar by its assessment of the likelihood that Plaintiff would have won and been entitled to fees in the first place.

II.   **Plaintiff would have had no more than a 1-in-4 chance of prevailing at trial, and thus the lodestar should be reduced a further 75% per the terms of the parties' settlement agreement to $9,085.71 total.**

Once the Court fixes the lodestar, the parties' settlement agreement calls for the Court to further reduce the lodestar in light of the fact that Plaintiff's entitlement to any FLSA amount remained in question, with Defendants taking the position that she did not work over 40 hours in any workweek. Plaintiff's counsel effectively try to evade this portion of the settlement agreement, telling the Court that, in effect, they had a 100% chance of victory and thus no adjustment should be made. *See* R. 53, Pg ID 1966-67. This is, frankly, preposterous:  Ms. Hicks admitted she had no evidence of her time during the 10 weeks in question except her own testimony, years after the fact, that were inconsistent with the actual records that did exist. At trial, the burden would be on *Hicks* to prove that she worked the hours she claimed, *and* her credibility would be called into question—a serious problem for her, as she has admitted to signing an error-ridden (frankly false) affidavit earlier in the case. As set forth below, Ms. Hicks would have had little chance of convincing a jury that she worked the hours she claimed.

**A.    Defendants' analysis of Hicks's time, even giving her the benefit of every doubt, showed less than 40 hours per week—and Hicks is no longer entitled to the benefit of the doubt at the trial stage.**

Defendants have actual time records in the form of patient records for all 202 visits Hicks made during the 10-weei transition period. Hicks concedes these are accurate to show actual visit time. R. 26-1, Pl's Dep. 72-74, 93. These records also accurately show documentation time when it was completed during the visit. *Id.* at 121, 140-44. Defendant also has records of the time Hicks spent attending meetings and of the number of miles driven by her. And Hicks testified that she accurately recorded such time and miles. *Id.* at 149, 155, 206.

While the electronic medical record program utilized by First Care at that time did not capture work time spent documenting patient records or other non-visit activities such as phone calls and scheduling, at the summary judgment stage, Defendants provided a summary chart—one that, consistent with the standard of review—gave Plaintiff every single benefit of the doubt on the time she might have spent on these non-documented tasks, including:

- Assuming that when the records showed an hour or less gap between visits, Hicks *never* used a minute of that time to do paperwork;

- Inflating by 50% the time that Hicks's supervisor, herself an RN, stated would be reasonable for completing paperwork-only visits;

- Assuming that Hicks never had non-compensable commute time for her first daily visit, unless the records specifically ruled out that assumption;

- Calculated the "drive time" for compensable commute time by assuming a slow driving speed of 30 mph, when much of her travel time would have been on highways or expressways;

- Double-counting office hours, to account for bi-monthly pay records that did not specify which individual workweeks those office hours fell into; and

- Crediting Hicks with 20 minutes of other non-visit activity on every day she had a paid visit, even if she did not even travel that day.

R. 26-4, Pg ID 169-70. Hicks, in her fee petition, ignores that these generous assumptions were made for the purpose of summary judgment in light of the burden of proof, and all of those assumptions would fall away at trial. And she offers no positive evidence to justify her claim of 50-60 hours per week.

**B.      Defendants would have provided testimony from other nurses, doing the same jobs, to show that the actual time needed to perform the visits was far less than Hicks claimed.**

At trial, Defendants would have produced testimony that—among other things—demonstrated the Hicks-friendly assumptions made for summary judgment purposes were unwarranted. For instance, a witness would have testified that nurses generally completed their paperwork between visits (meaning that the Hicks-friendly estimate above double-counted the same work as "drive time" and "paperwork time"). R. 26-2, Declaration of Nicolle Fleck, Pg ID 140. Likewise, there would have been testimony that Hicks's self-serving claims about the number of hours she spent on routine paperwork during the 10-weeks at issue in late 2015 were unreasonable and unbelievable. *See, e.g.*, R. 26-2, Declaration of Nicolle

-19-

Fleck (explaining that Hicks's time estimates were "absolutely false" and "not plausible," based on her own experience with the same paperwork and a review of Plaintiff's paid visits from October to December 2015.)[1] At the trial stage with the burden on Ms. Hicks, this testimony would help establish that it was more likely than not that Hicks did not work overtime, consistent with Defendants' analysis.

### C.   Hicks's *own*, undisputedly accurate timekeeping from January 2016 for the same types of visits shows that her 2015 time estimates were grossly excessive.

The testimony of Defendants' employees would have been bolstered by actual, uncontested evidence of the time that Hicks *actually* spent on paperwork in the same general timeframe, which was far less than what Hicks otherwise testified to. In January 2016—just after the time period in question—Hicks's timekeeping software was transitioned to a program called HomeCare Homebase (HCHB). Hicks agreed that this program accurately tracked the precise time she spent on documentation and non-visit activities. R. 26-1, Pl's Dep. 165, 169-171. She agreed that she was performing the same sort of work, and the same mix of work, after transitioning to HCHB, as she was doing in October to December 2015. *Id.* at

---

[1] The incorrect and implausible nature of Hicks's claims of 50-60 hours of work every week may also be inferred just by looking at the raw number of Hicks's visits, which varied *wildly* from week to week. For instance, Hicks had 29 visits the week of 10/25, but only 10 visits the week of November 8. *Compare* R. 26-5, Pg ID 200 *with id.*, Pg ID 202. For Hicks to suggest that she performed the same number of hours in each week, despite literally *triple* the visits in one week over the other, shows that Hicks's estimates are unreliable and unbelievable.

153-54. And she testified that it took her *longer* to document time in HCHB than it took her in the previous software from October-December 2015. *Id.* Nevertheless, Hicks's actual, uncontested HCHB time records show that the time she took to complete paperwork and perform non-visit activities was *far* less than Hicks's self-serving estimates. For instance:

- Hicks claimed "one to two hours" of post-visit paperwork for her 60-day recertifications, R.33, Pg ID 564. Her actual average post-visit time on that documentation in HCHB was 41 minutes. R. 26-4, ¶ 25.

- She claims "one hour" of post-visit paperwork for discharge visits. R. 33, Pg ID 564. Her actual average post-visit time spent doing that documentation in HCHB was only *two* (2) minutes—meaning she likely completed most of the documentation during the visit itself. R. 26-4, ¶ 25.

Again, this hard evidence—uncontested by Hicks—will only bolster Defendants' analysis showing that Hicks did not work overtime, and shows that Hicks's evidence to the contrary (her own testimony) is not reliable.

### D. Hicks has severe credibility problems, including her admission to signing an affidavit under oath that she barely read and that was admittedly filled with inaccuracies.

Finally, the jury would have heard about Ms. Hicks's hostility—or, at least, indifference—to telling the truth under oath. The genesis of her 50-to-60 hours per week claim was a declaration signed under penalty of perjury in the *Hutchins* action. But at her deposition, Hicks admitted that she did not draft the *Hutchins* declaration, that she spent only an hour on the phone with counsel's office while

-21-

they drafted it, and made no changes to the draft presented to her. R. 26-1 Pl's

Dep. at 175-76, 202-03. She also admitted that this declaration was filled with

numerous errors that contradicted her sworn testimony, including the amount of

pay she received for visits. *Id.* at 176-193. For instance:

- Hicks's declaration claimed that *every* visit she was paid for required "at a minimum, one hour in each patient's home, and usually longer." She settled on a 1.5 hour-per-visit figure in "calculating" her hours. R. 26-6 ¶¶ 9, 13. In her deposition, she admitted that some of her "visits" involved *no* time in a patient's home, and that visits could be completed in a half hour. R. 26-1, Pl's Dep. at 71, 150, 184, 189.

- The declaration stated that completing the documentation of a patient visit "in a patient's home is impossible and usually requires a minimum of 2 hours of time per visit completing the visit paperwork from home." She would use 2 hours per visit in "calculating" her hours. R. 26-6 ¶ 9, 13. At her deposition, when confronted with specific patient records, she admitted that paperwork *could* be completed in a patient's home (meaning there was no additional documentation time), and further backtracked on her "two hours per visit" in response to her own counsel's questioning. R. 26-1, Pl's Dep. at 182, 199-200.

Hicks further admitted that she had no documentation showing how much

time she spent on patient matters outside of the patient's home, having destroyed

those records, and although she claimed general recollections of how much time

she spent, she could not specifically say how much time she spent on any patient.

R. 26-1, Pl's Dep. at 151-164.

In short, (1) Hicks has already demonstrated a willingness to attest, under

oath, to false and inaccurate estimates of her time; (2) other nurses doing the same

job at the same location would testify to the actual time required for the tasks, and

that Hicks's estimates were implausible and false; and (3) Hicks's *own undisputed data* from the same general timeframe, with the same duties, show that she spent *far* less time doing the same tasks in 2016, in a more complex database, than what she claims it took her in 2015. Add to this Plaintiff's having the burden of proof at trial, as opposed to the summary judgment stage where her questionable testimony had to be accepted at face value, she would have been unlikely to succeed with a reasonable jury. Defendants, however, are aware that jury trials are inherently unpredictable, and thus ask the Court to find—at best—Plaintiff's chances were only 25% of succeeding at trial.[2] The lodestar amount (however the Court calculates it) should be reduced by 75% to account for these chances. Using Defendant's adjusted lodestar calculation of $36,342.84, this would amount to a final fee award of $9,085.71.

---

[2] Looked at another way, Defendant's proposed 25% is actually better than 25% of Plaintiff's potential recovery. Plaintiff claimed she worked 69 hours per week. (Pl's Brief p. 10) This would be 290 hours of overtime for the 10 weeks with premium pay of approximately $15/O.T. hour (i.e. one-half her regular rate of approximately $30/hour.) Her damages would be $4,350 (290 hours x $15). With liquidated damages under the statute, full recovery would be $8,700. Thus, the $2,000 settlement recovery is less than 25% proposed here by Defendant.

Respectfully submitted,

KIENBAUM HARDY VIVIANO
  PELTON & FORREST, P.L.C.

By: _s/Eric J. Pelton_
    Eric J. Pelton (P40635)
    Thomas J. Davis (P78626)
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI  48009
(248) 645-0000
epelton@khvpf.com
tdavis@khvpf.com

Dated:  May 23, 2019
328965

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 23, 2019, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

s/*Eric J. Pelton*
Eric J. Pelton (P40635)
Kienbaum Hardy Viviano
 Pelton & Forrest, P.L.C.
280 N. Old Woodward Avenue
Suite 400
Birmingham, MI  48009
(248) 645-0000
epelton@khvpf.com